GILBERTSON, Chief Justice
(on reassignment).
[¶ 1.] Monny Truman (Truman), individually and as special administrator of his wife Patricia’s estate, and Steven and Dee Ann Rounds[1] sued Darren Griese (Griese), in his official capacity as South Dakota Department of Transportation (DOT) Pierre Region Traffic Engineer, and employees of the DOT as John Does after a car accident forty miles west of Pierre. Griese moved for summary judgment based on sovereign immunity. The trial court granted Griese’s motion. Truman appeals.[2] We affirm.
FACTS
[¶ 2.] The accident occurred at the intersection of three highways: South Dakota Highway 34, South Dakota Highway 63, and United States Highway 14. This intersection is also known as “Four Corners.” The traffic design of this interchange is not easily conveyed in words. S.D. Highways 63 and 34 meet at a “T” intersection. S.D. 34 forms the top of the “T,” running east-west. S.D. 63 forms the bottom of the “T,” north-south, but continues west along the top-left part of the “T,” merging at a right angle with S.D. 34.
[¶ 3.] U.S. 14 travels across top -right part of the “T,” east-west with S.D. 34, then continues north-south with S.D. 63. However, U.S. 14 does not continue to a stop at the right angle intersection of the “T.” Instead, U.S. 14 curves between the two roads, just southeast of the “T.” This curved route creates two “Y” intersections at the junctions of U.S. 14 and S.D. 63 (south of the “T” intersection), and U.S. 14 and S.D. 34 (east of the “T” intersection). As a result of this design, the through-traffic on U.S. 14 does not stop to make the direction change. See Attachment 1.
[¶ 4.] On February 13, 2004, Monny and Patricia Truman, Dee Ann Rounds, twelve-year-old Ciara Rounds, and eight-year-old Zachary Rounds were driving in Truman’s vehicle from Pierre to Rapid City. They traveled west-bound on U.S. 14/S.D. 34. Truman approached Four Corners and followed U.S. 14 along the south-bound curve.
[¶ 5.] At the same time, Richard Giago was driving north on S.D. 63/U.S. 14 (The bottom of the “T”). Giago’s wife, Sue Ann, and son, Jayden, were passengers in his vehicle. When Giago reached the point where S.D. 63/U.S. 14 diverge, he continued northward on S.D. 63, across the “Y” junction.[3]
[¶ 6.] The vehicles collided almost head on. The results were devastating. Truman suffered broken bones, a skull injury, and permanent vision loss in his right eye; Patricia was killed; Dee Ann suffered severe head injuries and multiple broken bones; Dee Ann and Steven lost their unborn child, Jesse; Ciara and Zachary *78 suffered minor injuries; Giago and Jayden both suffered severe injuries and were hospitalized; Sue Ann was killed.
[¶ 7.] Truman brought claims against Griese for negligence, wrongful death and loss of consortium. Truman alleged Griese violated duties imposed by SDCL 31-28-6 by failing to post additional traffic control signs at Four Corners. Griese filed a motion for summary judgment on the basis of sovereign immunity. The trial court entered an order in favor of Griese’s motion.
[¶ 8.] Truman appeals the following issue:
Whether Truman’s claims under SDCL 31-28-6, regarding the necessity for and placement of highway warning signs, are barred by sovereign immunity under the facts of this case.[4]
STANDARD OF REVIEW
[¶ 9.] “Sovereign immunity is the right of public entities to be free from liability for tort claims unless waived by legislative enactment.” Public Entity Pool for Liability v. Score, 2003 SD 17, ¶ 7 n. 3, 658 N.W.2d 64, 67 n. 3 (citing Alden v. Maine, 527 U.S. 706, 715, 119 S.Ct. 2240, 2247, 144 L.Ed.2d 636 (1999)). “In the absence of constitutional or statutory authority, an action cannot be maintained against the State.” Id. (citing generally Lick v. Dahl, 285 N.W.2d 594 (S.D.1979); Darnall v. State, 79 S.D. 59, 108 N.W.2d 201 (1961); Griffis v. State, 68 S.D. 360, 2 N.W.2d 666 (1942); Mullen v. Dwight, 42 S.D. 171, 173 N.W. 645 (1919)) (emphasis added).
[¶ 10.] It is settled that whether sovereign immunity applies is a question of law. Bickner v. Raymond Township, 2008 SD 27, ¶ 10, 747 N.W.2d 668, 671 (citations omitted). “Whether sovereign immunity precludes a plaintiff from pursuing a claim is a question of law which is reviewed de novo.” King v. Landguth, 2007 SD 2, ¶ 8, 726 N.W.2d 603, 607 (citing Wulf v. Senst, 2003 SD 105, ¶ 19, 669 N.W.2d 135, 142 (citing Bego v. Gordon, 407 N.W.2d 801 (S.D.1987))). Additionally, the predicate question, whether the governmental duties under SDCL 31-28-6 are ministerial or discretionary, is a question of law for this Court. Bickner, 2008 SD 27, ¶ 10, 747 N.W.2d at 671 (citing Hansen v. SD Dept. of Transp., 1998 SD 109, ¶ 18, 584 N.W.2d 881, 885).
ANALYSIS AND DECISION
[¶ 11.] No one can look at the facts surrounding this litigation without a sense of sorrow. Lives were lost and lives were damaged. Yet our task is a narrow one — ■ to determine if the State of South Dakota’s sovereign immunity applies. In order to make this determination, first, we identify Truman’s claim as it relates to this action. Next, we address the distinction between ministerial and discretionary duties in recognizing sovereign immunity. Then, we apply our sovereign immunity analysis to SDCL 31-28-6. Finally, we address the inapplicability of Truman’s evidence and arguments regarding “material facts” in the grant of summary judgment on the basis of sovereign immunity. Because we conclude that Griese’s duties under SDCL 31-28-6 are discretionary, sovereign im *79 munity applies and the trial court is affirmed.
Truman’s Claim
[¶ 12.] It is useful to begin by restating the precise conduct that Truman alleges does not have the protection of sovereign immunity. Broadly, Truman asserts that the omission[5] of additional signs at Four Corners violated Griese’s duty to install traffic control signs pursuant to SDCL 31-28-6. This alleged omission could have occurred during one of two time periods— either in the initial engineering and design of the intersection, or when a duty to erect signs arose after the intersection was built.
[¶ 13.] The State has not waived sovereign immunity or consented to suit for any omission of signs that occurred during the initial engineering and design of Four Corners.
To the extent that any public entity, other than the state, participates in a risk sharing pool or purchases liability insurance and to the extent that coverage is afforded thereunder, the public entity shall be deemed to have waived the common law doctrine of sovereign immunity and shall be deemed to have consented to suit in the same manner that any other party may be sued.
SDCL 21-32A-1. Pursuant to SDCL 3-22-1, the engineering and design of roadways is specifically excluded from this State’s public entity pool for liability (PEPL).[6] Therefore, the State has not waived common law sovereign immunity for any omission that occurred during this time period.
[¶ 14.] Instead, Truman’s claim alleges that changes have occurred in the nature of the intersection since its construction, which requires the erection of new warning signs. Truman does not identify any physical changes that have occurred or that the road has fallen out of repair. Therefore, the only issue is whether the legal requirements, duties, or standards applied to this intersection have changed.
[¶ 15.] The PEPL Memorandum of Liability Coverage to Employees of the State of South Dakota, point 16, provides that the ministerial acts of a government actor are not excluded from coverage. Because these acts are not excluded from coverage, the PEPL fund provides coverage for damages that result from ministerial acts. Thus, Truman argues, sovereign immunity has been waived for these acts.
[¶ 16.] The issue of PEPL coverage is not the definitive issue regarding Griese’s purported liability. Even if, as argued by Truman and the dissent, PEPL coverage is a statutory waiver of sovereign immunity in this case, such a waiver alone does not create a duty where none would *80 otherwise exist. See Gulbranson v. Flandreau Tp. 458 N.W.2d 361, 363 (S.D.1990); Zens v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 386 N.W.2d 475 (S.D.1986). The waiver of immunity and consent to be sued “in the same manner that any other party may be sued” contained in SDCL 21-32A-1 does not itself impose duties on a public official with PEPL coverage. “The legislature’s intent to impose new duties upon public entities is simply not expressed in SDCL 21-32A-1. In fact, the term “duty” is not used at all in this statute.” Gulbranson, 458 N.W.2d at 363. “[Tjhe phrase ⅛ the same manner’ refers to a mode of procedure and not to the basis upon which a public entity may be sued.” Id. Therefore, for Truman’s claims to survive summary judgment on the basis of sovereign immunity, Truman must prove that Griese owed Truman a ministerial duty as a matter of law.
[¶ 17.] Truman claims that the Legislature has waived sovereign immunity for the omission of signs at Four Corners because, as he characterizes Griese’s duties under SDCL 31-28-6, this omission is a ministerial duty.
Sovereign Immunity: Ministerial and Discretionary Duties
[¶ 18.] Shortly after the adoption of Article III, section 27 of our State Constitution, this Court first recognized that sovereign immunity applied to the construction and maintenance of highways. Bailey v. Lawrence County, 5 S.D. 393, 59 N.W. 219 (1894).
[W]hile it is true that the legislature has imposed upon counties the duty of keeping in repair the bridges on the public highways, and provided the method for raising revenue by taxation requisite for such purpose, yet to hold that the counties are thereby made liable for injuries caused by defects in such bridges, in the absence of legislation making them so liable, would be a species of judicial legislation.
Id. at 221.
[¶ 19.] Shortly thereafter, we concluded that sovereign immunity applied to discretionary governmental duties but not to ministerial ones. State v. Ruth, 9 S.D. 84, 68 N.W. 189 (1896). In Ruth we defined a ministerial duty as a narrow one. It is where a governmental employee “disregarded a plain provision of the law[.]” Id. at 191. All other duties that fell outside that definition were discretionary. We also noted that “[i]t is the nature of the particular duty, and not the character of the office, which determines whether or not a duty is ministerial.” Id.
[¶ 20.] We have recently stated:
It is well-settled that suits against officers of the state in their official capacity, are in reality suits against the State itself. It is further settled that the State is generally immune from suit under Article III Section 27 of the South Dakota Constitution. With respect to individual capacity suits, state employees who are sued in an individual capacity are entitled to immunity dependent upon the function performed by the employee. State employees are generally immune from suit when they perform discretionary functions, but not when they perform ministerial functions.
Sisney v. Reisch, 2008 SD 72, ¶ 12, 754 N.W.2d 813, 818-19 (citations omitted).
[¶ 21.] [A] ministerial act is defined as absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed designated facts or the execution of a set task imposed by law prescribing and defining the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion, being a simple, definite duty arising un *81 der and because of stated conditions and imposed by law. A ministerial act envisions direct adherence to a governing rule or standard with a compulsory result. It is performed in a prescribed manner without the exercise of judgment or discretion as to the propriety of the action.
Hansen, 1998 SD 109, ¶ 23, 584 N.W.2d at 886 (citations omitted) (emphasis in original and added). See also King, 2007 SD 2, ¶ 12, 726 N.W.2d at 607; Wulf, 2003 SD 105, ¶ 20, 669 N.W.2d at 142; Casazza v. State, 2000 SD 120, ¶ 13, 616 N.W.2d 872, 875-76. “If the duties do not fall within [these] definition[s], they are not ministerial and thus are discretionary for this is the limits of the abrogation of sovereign immunity authorized by the Legislature.” Hansen, 1998 SD 109, ¶ 23, 584 N.W.2d at 886.
[¶ 22.] In order to find a duty “ministerial,” we must find a “governing rule or standard” so clear and specific that it directs the government actor without calling upon the actor to ascertain how and when to implement that rule or standard. Moreover, in Hansen, we reviewed the duties of that DOT official and noted “one could not pluck an ordinary citizen off the street and expect they could successfully execute the duties of [this office].” 1998 SD 109, ¶ 29, 584 N.W.2d at 887-888. See also Wulf, 2003 SD 105, ¶ 29, 669 N.W.2d at 146.[7]
Nature of the Duties Under SDCL 31-28-6
[¶ 23.] SDCL 31-28-6 provides:
The public board or officer whose duty it is to repair or maintain any public highway shall erect and maintain at points in conformity with standard uniform traffic control practices on each side of any sharp turn, blind crossing, or other point of danger on such highway, except railway crossings marked as required in § 31-28-7, a substantial and conspicuous warning sign, which sign shall be on the right-hand side of the highway approaching such point of danger. A violation of this section is a Class 1 misdemeanor.
(Emphasis added.) Truman alleges that the omission of warning signs at Four Corners is a violation of a ministerial duty under SDCL 31-28-6. We disagree.
[¶ 24.] Under SDCL 31-28-6, the “governing rule or standard” is not the mere presence of a “sharp turn, blind crossing, or other point of danger,” but the existence of “standard uniform traffic control practices.” See id. Contrary to Truman’s position presented at oral argument, the language “in conformity with standard uniform traffic control practices” does not refer to the characteristics of the “substantial and conspicuous warning sign.”[8] Instead, this phrase, “in conformity with standard uniform traffic control practices,” plainly modifies the “points” at which signs “shall” be located. Therefore, any ministerial duties pertaining to the placement of traffic control signs under this statute must be required by standard uniform traffic control practices.
[¶ 25.] The placement of signs in situations that have neither standard nor uniform practices must necessarily be outside any ministerial requirements of SDCL 31-28-6. We have previously held that such sign placement, per SDCL 31-28-6, requires “the exercise of judgment or discre *82 tion as to the propriety of the action.” Hansen, 1998 SD 109, ¶28, 584 N.W.2d at 886. Therefore, in order to establish a ministerial duty under this statute, “standard uniform traffic control practices” must exist and delineate at which specific points signs must be erected at this type of intersection. See SDCL 31-28-6.
[¶26.] This rule is neither new nor novel. In Bickner v. Raymond Township, summary judgment was unanimously affirmed by this Court, in part, because “Bickner cite[d] no provision in the MUTCD [a standard uniform traffic control manual] that specifically requires a township to erect a warning sign in these circumstances.” 2008 SD 27, ¶ 14, 747 N.W.2d 668, 672. As in Bickner, Truman has failed to provide specific governing provisions from the MUTCD or any other standard uniform traffic practice for intersections like Four Corners. The MUTCD diagrams Truman has presented depict other types of intersections. These other designs are inapplicable. See infra ¶¶ 37-40.
[¶ 27.] While Truman and the dissent seek to limit Bickner’s holding to the failure of the plaintiff to cite to a specific section of the MUTCD manual, the actual holding was broader and consistent with Hansen and Fritz v. Howard Tp., 1997 SD 122, 570 N.W.2d 240. In Bickner we held: “The [governmental entity] also cannot be held liable under SDCL 31-28-6 because the [entity’s] decision to erect a warning sign in the first place is protected by the doctrine of sovereign immunity. As this Court recognized in Hansen, the initial decision to erect warning signs is discretionary.” 2008 SD 27, ¶ 14, 747 N.W.2d at 672 (emphasis added).
[¶ 28.] The dissent makes much of the word “shall” as a mandatory directive as it is found in the text of SDCL 31-28-6. See infra ¶¶ 53-54. However, “[statutes and court rules must be construed in their entirety. The effect of the word ‘shall’ may be determined by the balance of the text of the statute or rule.” Discover Bank v. Stanley, 2008 SD 111, ¶ 21, 757 N.W.2d 756, 762-63 (citations omitted). In an examination of the text of SDCL 31-28-6, it is only when that public official in the exercise of his or her discretion determines that the public highway contains “any sharp turn, blind crossing or other point of danger on such highway” based upon “standard uniform traffic control practices” that he or she “shall erect and maintain ... a substantial and conspicuous warning sign ...”[9] The statute contained “shall” in 1997 when the dissenter of today authored the unanimous opinion of Fritz in which he held contrary to the position he now espouses:
Kiel [v. DeSmet Tp.] repeats a prior holding of this court, i.e., “that the failure of a governing board or body to install a road sign in the first instance does not give rise to a cause of action under [analogous statutes].” 90 S.D. 492,[ at 497, 242 N.W.2d 153,] at 156 [ (1976) ] (citing Dohrman v. Lawrence County, 82 S.D. 207, 143 N.W.2d 865 (1966); Reaney v. Union County, 69 S.D. 392, 10 N.W.2d 762 (1943)). Those cases dealt, not with defects such as the washout in this case but with instances where a sign was never erected to warn of sharp curves (Dohrman; Reaney) or steep hills (Dohrman). The rationale *83 for not imposing liability for failure to erect warning signs was that these conditions were inherent in the design or plan of the highway and did not result from the highway becoming defective because it fell out of repair. Dohrman, 82 S.D. at 210-11, 143 N.W.2d at 867; Reaney, 69 S.D. at 397, 10 N.W.2d at 764. Furthermore, as the Kiel court noted, “It may be assumed that public authorities in the discharge of their duties under this statute have a measure of discretion in determining what curves, crossings and other points of danger require a warning sign and failure to erect or install one, is not ordinarily actionable.” 90 S.D. at 496, 242 N.W.2d at 155.[10]
1997 SD 122, ¶ 15 n. 3, 570 N.W.2d at 243 n. 3 (emphasis added). The basis of his 1997 opinion was well founded as it soundly rested upon Kiel, which was also a unanimous opinion of this Court. Moreover, in Hansen, we examined the issue for a third time and construed SDCL 31-28-6 as creating a discretionary duty upon the defendant protected by sovereign immunity.[11]
[¶ 29.] Additionally, Truman fails to recognize that in order for a government actor to be “in conformity with” standards and to “perform [them] in a prescribed manner,” the standard must preexist the act itself. Without preexisting standards, there is no stated policy for the state actor to implement.[12] If the *84 Legislature or other policy maker has not demanded performance, the decision to act or not is discretionary. Furthermore, absent evidence of new standards for this traffic design, Truman implicitly challenges the initial engineering and design of Four Corners. As stated above, omissions from the initial engineering and design are clearly protected by sovereign immunity. See supra ¶ 13.
[¶ 30.] Ultimately, Truman argues that Four Corners contains a design that he believes is unsafe. Because of its non-standard design, he is unable to establish standard uniform traffic control practices regarding the placement of warning signs. Without standard uniform traffic control practices, the placement or omission of signs by government actors is discretionary under SDCL 31-28-6.[13]
[¶ 31.] Wulf, 2003 SD 105, 669 N.W.2d 135, so heavily relied upon by Truman and the dissent, is obviously distinguishable. See infra ¶¶ 62-65. It did not deal with SDCL 31-28-6 or the subject of the placement of highway signage. More importantly, Wulf dealt with a very specific DOT policy regarding sanding and plowing roadways during snowstorms. This policy dictated exactly when and how sanding was to occur. The Wulf court followed Hansen in concluding that the specific DOT Policy 2571, regarding the times and methods for sanding in a snowstorm, amounted to a virtual check-list with no discretion as to whether to do sanding, when to do it, or how to do it. Thus, the duties of the defendant DOT supervisors “may be defined and applied with relative ease,” and were ministerial. Wulf, 2003 SD 105, ¶ 32, 669 N.W.2d at 147 (quoting Hansen, 1998 SD 109, ¶ 31, 584 N.W.2d at 888) (quoting DuBree v. Commonwealth, 481 Pa. 540, 393 A.2d 293, 295 (1978)). In reaching this conclusion, we also held that “but for” DOT Policy 2571:
Decisions made by Senst and Bultje as to how to allocate snow plow operators, resources and equipment, how many workers to call in for any given winter storm event, how many trucks to put on the road at any given time and where on the highways to place those vehicles are all discretionary and subject to sovereign immunity.
Wulf, 2003 SD 105, ¶28, 669 N.W.2d at 145-146. Thus, what limited relevance Wulf brings to the question now before us actually supports Griese’s argument.
[¶ 32.] In conclusion, “[a]ny decision regarding the installation of additional markers at this [location] was a discretionary function. The circuit court’s grant of summary judgment has not been shown to be improper as sovereign immunity bars [plaintiffs] negligence claim against the DOT employees.” King, 2007 SD 2, ¶ 21, 726 N.W.2d at 610.
Truman’s Evidence and Material Facts Concerning Sovereign Immunity
[¶ 33.] In order to determine whether the sovereign immunity defense applies, a *85 court must, to some extent, consider the factual context of the case. A valid basis for summary judgment exists when the legal conclusion is made that an act was discretionary in its context, thus under the aegis of sovereign immunity. However, Truman and the dissent argue that the MUTCD diagrams and other evidence create a question of fact. Because a question of fact exists, they argue, a jury should determine the applicability of these diagrams. Further, they argue, this question of fact precludes summary judgment. We disagree.
[¶ 34.] The introduction of factual information in order to properly categorize a government actor’s duty as ministerial or discretionary does not transform sovereign immunity analysis from a question of law to a question of fact.
[I]n the final analysis, the decision as to whether a public official’s acts are discretionary or ministerial must be determined by the facts of each particular case after weighing such factors as the nature of the official’s duties, the extent to which the acts involve policymaking or the exercise of professional expertise and judgment, and the likely consequences of withholding immunity.
Hansen, 1998 SD 109, ¶23, 584 N.W.2d at 886 (citations omitted) (emphasis in original). We have consistently held that a determination of sovereign immunity and whether the governmental duty was discretionary is a question of law for the courts. See supra ¶ 10. To place such an issue in the hands of the jury is a de facto judicial repeal of sovereign immunity and relegates the matter to a jury question of negligence. Instead of a single standard concerning the application of sovereign immunity, as is cited in the cases above from Ruth in 1896 onward, such a repeal would lead to each of our State’s 66 counties having its own standard for sovereign immunity, set not by the Legislature, but by a local county jury.
[¶ 35.] Even if Truman’s evidence did raise what he argues are factual issues, this evidence would not create a question for the jury. “The existence of a duty in a negligence action is a question of law....” Kirlin v. Halverson, 2008 SD 107, ¶10, 758 N.W.2d 436, 444 (quoting Hohm v. City of Rapid City, 2008 SD 65, ¶ 3, 753 N.W.2d 895, 898 (citing State Auto Ins. Cos. v. B.N.C., 2005 SD 89, ¶20, 702 N.W.2d 379, 386)). The doctrine is the same when a motorist sues a governmental entity over the conditions of highways under its jurisdiction. Fritz, 1997 SD 122, ¶ 8, 570 N.W.2d at 242. When the defendant is a government actor, however, sovereign immunity analysis requires a further classification of the defendant’s duty. The trial court must classify the defendant’s duty as either discretionary or ministerial. This is a legal determination. See supra ¶ 10. Therefore, the factual circumstances that inform the trial court’s classification are part of the trial court’s duty analysis. The factual circumstances are only applicable to the legal questions of the existence or classification of a government actor’s duty; they are not relevant to the jury’s domain in deciding issues of breach, causation, and damages. Therefore, consideration of these circumstances does not diminish the jury’s role. Truman’s argument is incorrect. The evidence he presents does not automatically create a question for the jury or preclude summary judgment.
[¶ 36.] Truman also suggests that the trial court erred because his evidence establishes that Griese’s duties are ministerial. After considering the evidence presented, we disagree. One of Truman’s experts believes that the curve on U.S. 14 was constructed “to allow free flow of traffic along U.S. 14 from east west to north *86 south.” Further, “the curve [was] installed to provide a high speed transition for the major road[, U.S. 14].” The MUTCD designs offered by Truman do not show or contain this traffic design or this type of interchange.[14]
[¶ 37.] One diagram presented by Truman, the “acute angle intersection,” focuses solely on the geometry of the U.S. 14/S.D. 63 junction. This design shows a stop sign at the end of the U.S. 14, contrary to the curve’s “free flow” traffic design.[15] This narrowed focus on one part of Four Corners’s geometry neglects the multiple traffic factors presented, and portrays a totally different traffic scenario and design. The diagram’s “acute angle,” or “sharp turn” as Truman argues, is a right-hand turn from the angled street onto the horizontal street. However, traffic on U.S. 14 does not make a right-hand “sharp turn” onto S.D. 63. Drivers approaching Four Corners from U.S. 14/S.D. 34 who want to reach S.D. 63’s continued path proceed straight on S.D. 34 to the “T” intersection where S.D. 63 and 34 merge. This “acute angle” diagram does not depict the traffic design of Four Corners. Therefore, this diagram is inapplicable.
[¶ 38.] Similarly, the “channelized intersection” diagram differs in its basic traffic design. The curve of the channelized intersection is a one-way, right-hand *87 turning lane. This design does not permit traffic to travel in both directions on the curve, as evident by the absence of a cen-terline. Furthermore, the signs depicted in the diagram would not have been visible or applicable to either Truman or Griese, given their directions of travel. This design is also inapplicable.
[¶ 39.] Truman presents a number of witnesses’ deposition testimony, including the Stanley County Sheriff, to suggest the existence of a “blind crossing” or a “point of danger.” None of this testimony is relevant to the question of sovereign immunity. Truman and his witnesses provide no statutory definition for what constitutes a “blind crossing” or “point of danger”[16] under any “standard uniform traffic control practice” that would give rise to a ministerial duty. See SDCL 31-28-6.
[¶ 40.] Considering the chain of implications that results from Truman’s argument, a logical inconsistency becomes apparent. If the duty in SDCL 31-28-6 is ministerial, then it is not protected by sovereign immunity. If the duty is not protected by sovereign immunity, then a jury must determine what “standard uniform traffic control practices” are. If the jury must determine what “standard ... practices” are, then these “standard ... practices” are subject to interpretation. If “standard ... practices” are subject to interpretation, then they are not “absolute, certain and imperative.” See supra ¶ 21. If they are not “absolute, certain and imperative,” then they do not fit our definition of “ministerial.” [17] If they do not fit our definition of “ministerial,” then they are “discretionary.” If they are “discretionary,” then they are protected by sovereign immunity.
[¶ 41.] As a matter of law, absent the “standard uniform traffic control practices” required by SDCL 31-28-6, the MUTCD designs and the deposition testimony do not establish a ministerial duty. Truman presents no issues of fact relevant to sovereign immunity. The trial court correctly concluded that Griese’s duties were discretionary.
CONCLUSION
[¶ 42.] One can only imagine the reaction of an average citizen if he or she, per our analysis in Hansen and Wulf, were “plucked off the street” and informed it was now his or her legal duty to place “substantial and conspicuous warning signs” at any “sharp turn, blind crossing or other point of danger” as defined by “standard uniform traffic control practices” on every highway in this state. See supra ¶22. How much stronger would their reaction be when they realize that the failure to place a sign in every conceivable place would result in their being subjected to suit and criminal charge[18] simply based on a plaintiffs pleading disagreeing with the initial placement decision, and a jury being allowed to “Monday morning quarterback” his or her conclusions about what is a “sharp turn, blind crossing or other point of danger,” even if he or she somehow followed “standard uniform traffic control practices?” There is a reason that the duty to select appropriate places for warning signs was entrusted to deten- *88 dant Griese, who happens to be the Pierre Region Traffic Engineer of the South Dakota Department of Transportation. Given the thousands of miles of highways in this state that run over all kinds of terrain, such an undertaking is not a ministerial task for amateurs; it calls for a person with professional training to exercise professional discretion in the performance of his or her duties under SDCL 31-28-6.
[¶43.] SDCL 31-28-6 requires appropriate warning signs in places where “standard uniform traffic control practices” indicate or where the exercise of the engineer’s discretion determines a “sharp turn, blind crossing or other point of danger” exists. Thus, there are basically three options when one looks at SDCL 31-28-6: signs everywhere, signs nowhere, or signs at some points placed there by the exercise of the collective discretion of experts as expressed in uniform standards and the individual discretion of experts in non-standardized situations. Under our settled law, absent applicable uniform standards, the individual expert’s decisions are protected by sovereign immunity until the Legislature decides otherwise.
[¶ 44.] The serious consequences of this accident are tragic. Yet, sovereign immunity precludes this action against these defendants. For the above reasons, we affirm.
[¶ 45.] KONENKAMP and ZINTER, Justices, concur.
[¶ 46.] MEIERHENRY, Justice and SABERS, Retired Justice, dissent.

. Steven and Dee Ann sued individually; as conservators for their children, Ciara and Zachary; and as the natural parents of their deceased unborn child, Jesse. The Trumans are Dee Ann’s parents.

. The plaintiffs/appellants will be referred to as Truman unless further distinction is necessary. Likewise, the defendants/appellees will be referred to as Griese.

.Signs warned of the oncoming curve from both directions, and a double yellow line crossed the junction down the center of U.S. 14, across S.D. 63’s north-bound path.

. Truman presents the issue as an ail-encompassing holding "regardless of the facts of any particular case." (Appellants’ Brief, p. 2). Such an approach is outside the scope of appellate review of this case. Throughout our numerous cases dealing with governmental entities and potential liability for failure to maintain highways, the question was, and continues to be, whether a plaintiff has identified facts particular to his or her case that establish, as a matter of law, that the function allegedly omitted is a ministerial function.

. This Court has drawn a distinction between cases where existing signs are knocked over or damaged, which only takes the ministerial task of restoring or replacing, and cases where there was never a sign to begin with.
In Fritz v. Howard Tp„ 1997 SD 122, ¶20, 570 N.W.2d 240, 244, we concluded:
Once a warning sign is erected, it becomes a physical and integral part of the highway. As an appurtenant part of the highway the county had a continuing duty to maintain and keep the sign in reasonable repair for the safety of public travel.
(quoting Kiel v. DeSmet Tp., 90 S.D. 492, 497, 242 N.W.2d 153, 155 (1976)).

. This exclusion from PEPL coverage is also contained in PEPL Memorandum of Liability Coverage to the Employees of the State of South Dakota 13-15, point 10.
Even if PEPL coverage existed, such coverage is not necessarily relevant to the issue of the waiver of sovereign immunity. This Court has unanimously and recently held that the purchase of liability insurance does not waive statutory governmental immunities. Unruh v. Davison County, 2008 SD 9, 744 N.W.2d 839.

. Compare with Kyllo v. Panzer, 535 N.W.2d 896 (S.D.1995) wherein we held an automobile being driven by a state employee was a ministerial duty. Presumably one could pluck off the street an adult in South Dakota and be assured that the vast majority were capable of driving an automobile.

. Such characteristics include the size, shape and color of warning signs.

. The dissent ignores the qualifying language, "at points in conformity with standard uniform traffic control practices,” in discussing the duties under SDCL 31-28-6. As a consequence, the dissent would supplant jury determinations for the statute's uniform standards. Such a conclusion radically alters the discretionary/ministerial distinction from a question of law to a question of fact, contrary to our longstanding precedent. See supra 11 10.

.The dissent suggests that the duties under SDCL 31-28-6 are ministerial because the statute provides for misdemeanor criminal penalties. See infra ¶ 59. Following the dissent’s rationale, the existence of the criminal penalty itself makes all sign placement ministerial. The dissent declares that "the duties [under SDCL 31-28-6] are not discretionary.” Id. This directly contradicts the quoted passage from Fritz, which today's dissenting author wrote. Furthermore, if the dissent were correct and the criminal penalty is the "fatal defect to the majority’s reasoning,” then all of our previous cases finding discretionary duties under SDCL 31-28-6 have the same fatal defect and would have to be overruled. Cases decided under SDCL 31-28-6 and predecessor statutes: Bickner, 2008 SD 27, 747 N.W.2d 668 (“[TJhere exists ‘a measure of discretion when determining when warning signs are necessary and that failing to erect signs is generally not actionable.' ”); Hansen, 1998 SD 109, 584 N.W.2d 881 (Finding the placement of warning signs a discretionary act in the absence of uniform traffic control practices); Fritz,' 1997 SD 122, 570 N.W.2d 240; Kiel, 90 S.D. 492, 242 N.W.2d 153 (1976) (adopting and quoting Jensen v. Hutchinson County, 84 S.D. 60, 166 N.W.2d 827 (1969) (Hanson, J., dissenting)); Dohrman, 82 S.D. 207, 143 N.W.2d 865 (1966); Reaney, 69 S.D. 392, 10 N.W.2d 762 (1943).
Further, the only ministerial duties that arise under SDCL 31-28-6 and could lead to criminal penalties are found in "standard uniform traffic control practices.” According to the plain language of the statute, it is only these “standard ... practices” that the Legislature has mandated and penalized. This is all that the Legislature has stated “shall" be done. The dissent fails to address this qualifying language in the statute. The Legislature has not required performance in non-standard situations. Decisions regarding sign placement in non-standard traffic control practices must be discretionary.
In order to evade sovereign immunity, the dissent transforms Griese’s discretionary duty into a ministerial one by "reading out” the statute’s "standard ... practices.” In effect, this “reading out” is as much a "species of judicial legislation” as if we were to "hold that the counties are ... made liable for injuries caused by defects in ... bridges, in the absence of legislation making them so liable.” Bailey, 59 N.W. at 221; see supra ¶ 18.

. The dissent once again raises the same type of arguments that it raised in its solitary dissent in Hansen and which we rejected at that time. We continue to reject those arguments today. See 1998 SD 109, ¶¶ 39-54, 584 N.W.2d 881, 889-895 (Sabers, J., dissenting).

. This Court has previously recognized the distinction between creating governmental policy and merely implementing the same. *84 See King, 2007 SD 2, ¶ 11, 726 N.W.2d at 607 (quoting Kyllo v. Panzer, 535 N.W.2d 896, 902 (S.D.1995)) (noting that sovereign immunity extends to employee’s discretionary acts because "such discretionary acts participate in the state's sovereign policy-making power.”) (emphasis added); Wulf, 2003 SD 105, ¶ 20, 669 N.W.2d at 143 ("a ministerial act is the simple carrying out of a policy already established ...”); Nat’l Bank of SD v. Leir, 325 N.W.2d 845, 850 (SD 1982).

. The question of whether the State should re-engineer, redesign, or reconstruct these types of intersections is beyond the authority of this Court. That is a policy decision best left to the DOT and the Legislature. This Court will defer to their discretion in the design of Four Corners and similar intersections.

. If SDCL 31-28-6 were interpreted to require the government actor to apply standardized diagrams to non-standard intersections, he or she would be forced to use his or her skill and judgment to alter the designs to the traffic scenario presented at Four Corners. Such an adaptation, essentially, would be an exercise of his or her discretion.
Moreover, the MUTCD signage designs do not require direct adherence. Instead, MUTCD defers to engineering judgment and studies when making sign placement decisions. Therefore, the MUTCD requires the engineer to exercise his or her discretion and expertise. Section 2A.03 — Standardization of Application provides:
[[Image here]]
Guidance: Signs should be used only where justified by engineering judgment or studies, as noted in Section 1A.09. Results from traffic engineering studies of physical and traffic factors should indicate the locations where signs are deemed necessary or desirable ....
(Emphasis added.)
Section 2B.05 STOP Sign Applications provides:
Guidance: STOP signs should be used if engineering judgment indicates that one or more of the following conditions exist....
(Emphasis added.)
Section 2B.08 YIELD Sign Applications provides:
Option: YIELD signs may be used instead of STOP signs if engineering judgment indicates that one or more of the following conditions exist ...
D. An intersection where a special problem exists and where engineering judgment indicates the problem to be susceptible to correction by the use of the YIELD sign.
(Emphasis added.).

. Truman suggests that traffic on U.S. 14 maltes a left-hand turn onto S.D. 16/U.S. 14. This is not accurate. The curve creates a continuous path for U.S. 14 throughout the transition. No turn is required. This diagram does not represent the same traffic or geometric design; it is not the "exact same design.” See infra ¶ 69. Truman’s expert suggests that the continuous "free flow” of traffic on U.S. 14 was part of the planned design when the curve was installed decades ago. The curve was installed so that traffic on U.S. 14 did not have to proceed to the "T” intersection, stop moving, and then turn to continue. Quite simply, Truman and the dissent suggest returning to a traffic design similar to that which existed before the curve was installed; traffic on U.S. 14 (the "major road”) stops before proceeding. In essence, they suggest that the implementation of a "free flow” traffic design on U.S. 14 is problematic. Their positions, therefore, directly challenge the roadway’s initial engineering and design. The initial design is protected by sovereign immunity. See supra ¶ 13.

.Although we do not reach the factual issues in this case, the record indicates the following information: the accident rate at Four Corners is 1.08 per million users; the statewide average accident rate during this time period was 2.0 per million users; the 2.0 figure is also used by the DOT as a threshold to justify the spending of Road Safety Improvement funds.

. This Court’s definition of ministerial acts is presented at ¶¶ 19-22 supra.

. Violation of SDCL 31-28-6 is a class one misdemeanor.