#30857, #30872-a-MES
**2026 S.D. 14**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ESTATE OF KYLEE L. SANBORN, by
and through its Personal Representative,
Sarah C. Sanborn, and ESTATE OF JAYNA
R. SANBORN, by and through its Personal
Representative, Sarah C. Sanborn,            Plaintiffs and Appellants,

     v.

MARK PETERSON, TODD HERTEL,
BRAD LETCHER, DAN MARTEL,
MICHAEL HIEB, and TERENCE PECK,            Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE KENT A. SHELTON
Judge

\* \* \* \*

JOHN W. BURKE of
Thomas Braun Bernard &
    Burke, LLP
Rapid City, South Dakota

\* \* \* \*

ARGUED
OCTOBER 8, 2025
OPINION FILED **03/04/26**

* * * *

MICHAEL J. SCHAFFER
PAUL H. LINDE of
Schaffer Law Office, Prof. LLC
Sioux Falls, South Dakota      Attorneys for plaintiffs and appellants.


JUSTIN L. BELL
DOUGLAS A. ABRAHAM
ROBERT B. ANDERSON of
May Adam Gerdes &
    Thompson, LLP
Pierre, South Dakota      Attorneys for defendants and appellees.

#30857, #30872

SALTER, Justice

[¶1.] Following the death of her two daughters in a car accident that occurred along U.S. Highway 281, Sarah Sanborn brought suit against several South Dakota Department of Transportation (DOT) employees in both their individual and official capacities. Sarah claims that the fatal accident resulted from the DOT employees' negligent failure to maintain and repair the adjacent gravel shoulder in compliance with governing standards. The DOT employees moved for summary judgment, asserting Sarah's claims were barred by sovereign immunity and the public duty doctrine. The circuit court granted the defendants' motion for summary judgment drawing on both arguments. The court determined that sovereign immunity barred Sarah's official capacity claims but not the individual capacity ones, which the circuit court ultimately found to be barred by the public duty doctrine. Sarah appeals the public duty decision, and the defendants seek review of the court's decision denying summary judgment of the individual capacity claims based on sovereign immunity. We affirm the circuit court's grant of summary judgment on the individual capacity claims, but we do so under the doctrine of sovereign immunity.

## Factual and Procedural History

[¶2.] On November 24, 2019, Kylee Sanborn and her older sister Jayna were tragically killed in an automobile crash on U.S. Highway 281 near Bonilla in Beadle County. As the girls approached a slight curve in the road, their car drifted to the right, across the white fog line and on to the gravel shoulder, which was five to six inches below the paved roadway.

[¶3.]    Kylee was driving, and in the moments that followed, she attempted to steer the car left, back on to the roadway from the lower shoulder, resulting in an overcorrection that caused the car to veer into the southbound lane and into oncoming traffic. After narrowly missing a fuel truck, Kylee and Jayna collided head on with a pickup.

[¶4.]    Following the accident, Sarah brought this wrongful death and survivor action as the personal representative of her daughters' estates. The amended complaint named as defendants six DOT employees in both their official and individual capacities: (1) Mark Peterson—the region engineer for the DOT's Aberdeen region, (2) Todd Hertel—the Aberdeen region's operations engineer, (3) Dan Martel—the Aberdeen region's traffic engineering supervisor, (4) Brad Letcher—a DOT area engineer, (5) Michael Hieb—a DOT highway maintenance supervisor from 2010 through 2021, and (6) Terence Peck—a DOT lead maintenance worker.

[¶5.]    In an amended complaint, Sarah alleges that "[b]ecause Highway 281 is part of South Dakota's state trunk [highway] system, the Defendants are responsible for the construction, maintenance, repair, and condition of Highway 281, including, but not limited to, the shoulders . . . ." She asserts that the defendants had both statutory and common law duties to maintain and repair the shoulder along Highway 281, alleging further that these duties are specifically defined in the DOT's maintenance manual, which contains the policies, standards, and guidelines for highway maintenance.

[¶6.]	The manual in effect at the time of the accident (November 2019) included a policy letter titled, "Policy Number: OM-2002-09," which required "[e]xisting gravel shoulders" to be maintained in their "design condition."  Because Highway 281 was designed and constructed with a gravel shoulder that was flush with the paved portion of the roadway, Sarah alleges the defendants breached a ministerial duty by failing to maintain a flush shoulder.

[¶7.]	The policy letter also incorporated specific performance standards, such as Performance Standard Function 2158, which relates specifically to gravel shoulder maintenance and repair.  Drawing on these performance standards, Sarah alleges that Highway 281's gravel shoulder should have been repaired "when the shoulder surface [sank] more than one and a half inches lower than the pavement, and in isolated areas where gravel ha[d] been lost."

[¶8.]	Highway 281 is also part of the National Highway System and subject to a stewardship agreement between the DOT and the Federal Highway Administration (FHWA).  Sarah alleges that this obligated the DOT "to follow the American Association of State Highway and Transportation Officials ('AASHTO') standard," which also requires "shoulders to be maintained flush with the pavement."  Sarah asserts that under its federal stewardship agreement, the DOT agreed to abide by "the control documents for the design of highways, including the policy on *Geometric Design of Highways and Streets* (commonly referred to as the 'Green Book'), the *Roadside Design Guide*, and other standards."

[¶9.]	The defendants moved for summary judgment asserting first that sovereign immunity bars Sarah's claims because the governing standards for

highway maintenance and repair that she identifies impose discretionary, not ministerial, duties. As such, the defendants contend the State has not waived sovereign immunity for the conduct underlying her claims.

[¶10.]     Under a separate summary judgment argument, the defendants assert that the public duty doctrine precludes Sarah's claims. They asserted that highway maintenance and repair are public safety functions that implicate public duties to the motoring public generally—not private actionable duties.

[¶11.]     The circuit court granted the defendants' motion in a mixed decision. The court concluded that the defendants were entitled to sovereign immunity in their official but not individual capacities. The court reasoned that Policy Number OM-2002-09 created a ministerial duty for the DOT to maintain gravel shoulders "in accordance with the[ir] initial design plan[s]." The court did, however, grant complete summary judgment in the defendants' favor after concluding that highway maintenance and repair is "an act of public safety" and that Sarah's claims are therefore barred by "the public duty doctrine[, which] extends to a government employee being sued on an issue involving law enforcement or public safety."

[¶12.]     Sarah appeals the circuit court's application of the public duty doctrine. And by notice of review, the defendants seek reversal of the court's decision to deny the motion for summary judgment on the individual capacity claims under its sovereign immunity theory.

## Analysis and Decision

[¶13.]     The facts giving rise to this case are utterly heart-rending, and the magnitude of Kylee and Jayna's loss to their family is incomprehensible. Critically,

though, this appeal does not question or seek to weigh the tragedy of Kylee and Jayna's loss.

[¶14.] Nor does it present for our review the reasonableness of the defendants' conduct in the actual maintenance of Highway 281's shoulder where the fateful collision occurred. That question is secondary to whether Sarah can maintain her action against the defendants—all of whom are DOT employees—in the midst of established legal doctrines that sharply limit a private citizen's ability to sue the government or its employees for allegedly negligent conduct. Consequently, even with the pall of personal tragedy hanging over this case, "our task [on appeal] is a narrow one"—to determine whether the circuit court's grant of summary judgment was proper. *Truman v. Griese*, 2009 S.D. 8, ¶ 11, 762 N.W.2d 75, 78.

***Summary judgment standard***

[¶15.] "We review a circuit court's entry of summary judgment" de novo. *Healy Ranch, Inc. v. Healy*, 2022 S.D. 43, ¶ 17, 978 N.W.2d 786, 793 (quoting *Est. of Stoebner v. Huether*, 2019 S.D. 58, ¶ 16, 935 N.W.2d 262, 266). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Weiland v. Bumann*, 2025 S.D. 9, ¶ 36, 18 N.W.3d 148, 158 (quoting *Barr v. Cole*, 2023 S.D. 60, ¶ 18, 998 N.W.2d 343, 349); SDCL 15-6-56(c).

*The doctrine of sovereign immunity*

[¶16.] At common law, an individual had no right to sue a public authority or its employees. *See* The Federalist No. 81 (Alexander Hamilton) ("It is inherent in the nature of sovereignty not to be amendable to the suit of an individual without its consent. This . . . exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union."); *Hans v. Louisiana*, 134 U.S. 1, 16 (1890) ("The suability of a State, without its consent, was a thing unknown to the law. This has been so often laid down and acknowledged by courts and jurists that it is hardly necessary to be formally asserted.").

[¶17.] Any right to sue a sovereign must be created—not by the courts—but by the Legislature, as we have specifically held: "Under the South Dakota Constitution, '[t]he Legislature shall direct by law in what manner and in what courts suits may be brought against the state.'" *LP6 Claimants, LLC v. S.D. Dep't of Tourism & State Dev.*, 2020 S.D. 38, ¶ 13, 945 N.W.2d 911, 915 (alteration in original) (quoting S.D. Const. art. III, § 27). The resulting legal doctrine known as sovereign immunity describes "the right of public entities to be free from liability for tort claims unless waived by legislative enactment." *Id.* (quoting *Bickner v. Raymond Twp.*, 2008 S.D. 27, ¶ 10, 747 N.W.2d 668, 671).

[¶18.] Under limited circumstances, this immunity also extends to state employees. For instance, sovereign immunity applies to state employees when they perform discretionary functions. *King v. Landguth*, 2007 S.D. 2, ¶ 10, 726 N.W.2d 603, 607 (citing *Wulf v. Senst*, 2003 S.D. 105, ¶ 20, 669 N.W.2d 135, 142); *see also Kyllo v. Panzer*, 535 N.W.2d 896, 902 (S.D. 1995) (explaining the history of

sovereign immunity and personal liability in South Dakota). But immunity does not attach—and employees remain subject to suit—"when state employees perform ministerial functions." *King*, 2007 S.D. 2, ¶ 10, 726 N.W.2d at 607 (citing *Wulf*, 2003 S.D. 105, ¶ 20, 669 N.W.2d at 142). The distinction is sourced to the exercise of sovereign power, itself.

[¶19.] "The reason that state employees are shielded from lawsuits by the state's immunity when they perform discretionary acts within the scope of their authority is that such discretionary acts participate in the state's sovereign policy-making power." *Ritter v. Johnson*, 465 N.W.2d 196, 198 (citing *Nat'l Bank of S.D. v. Leir*, 325 N.W.2d 845, 850 (S.D. 1982)). Conversely, "a ministerial act is the simple carrying out of a policy already established, so . . . permitting state employees to be held liable for negligence in the performance of merely ministerial duties within the scope of their authority does not compromise the sovereignty of the state." *Id.* (citation modified).

[¶20.] "Whether an act is discretionary or ministerial is a question of law" that we review de novo. *McGee v. Spencer Quarries, Inc.*, 2023 S.D. 66, ¶ 30, 1 N.W.3d 614, 624 (citing *Truman*, 2009 S.D. 8, ¶ 10, 762 N.W.2d at 78). We recently described a ministerial act in unyielding terms in *McGee*:

> [A] ministerial act is defined as absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed designated facts or the execution of a set task imposed by law prescribing and defining the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion, being a simple, definite duty arising under and because of stated conditions and imposed by law. A ministerial act envisions direct adherence to a governing rule or standard with a compulsory result. It is performed in a

> prescribed manner without the exercise of judgment or discretion as to the propriety of the action.

*Id.* (alteration in original) (quoting *Truman*, 2009 S.D. 8, ¶ 21, 762 N.W.2d at 80–81).

[¶21.]     This ministerial act definition marks the extent of the Legislature's abrogation of sovereign immunity.  That means all duties falling outside of this definition are discretionary and entitled to the protection of sovereign immunity.  *Id.*; *see LP6 Claimants*, 2020 S.D. 38, ¶ 13, 945 N.W.2d at 915 ("Any waiver of the State's sovereign immunity must be expressly identified by the Legislature.").

[¶22.]     But this ministerial-discretionary dichotomy may be easier to formulate than apply in any given case.  At some level of abstraction, perhaps every governmental function that envisions a particular outcome could arguably be considered "ministerial."  And yet, "[i]n a strict sense, every action of a governmental employee, except perhaps a conditioned reflex action, involves the use of some degree of discretion."  *Swanson v. United States*, 229 F. Supp. 217, 219–20 (N.D. Cal. 1964); s*ee McGee*, 2023 S.D. 66, ¶ 34, 1 N.W.3d at 625 (observing "the distinction between discretionary and ministerial acts is often one of degree" (quoting *Wulf*, 2003 S.D. 105, ¶ 23, 669 N.W.2d at 144)).  For this reason, the "determination of what acts constitute discretionary or ministerial functions requires an individualized inquiry."  *McGee*, 2023 S.D. 66, ¶ 34, 1 N.W.3d at 625; *see also Hansen v. S.D. Dep't of Transp.*, 1998 S.D. 109, ¶ 23, 584 N.W.2d 881, 886 (stating that "whether a public official's acts are discretionary or ministerial must be determined by the facts of each particular case" (quoting 63C Am. Jur. 2d *Public Officers and Employees* § 327, 775–76 (1997))).

[¶23.]     Here, the defendants contend that the circuit court erred when it concluded that Policy Number OM-2002-09—the flush shoulder requirement—created a ministerial duty. In their view, the performance standards that the policy incorporates are discretionary, and the act of maintaining gravel shoulders cannot be "absolute, certain, and imperative." In response, Sarah argues that Policy Number OM-2002-09 "is *the* policy regarding shoulder maintenance" and therefore establishes a ministerial duty, as do state and federal statutes, federal highway guidebooks, and unwritten standards based on employee experience. We examine each source that Sarah asserts as a basis for a ministerial duty.

### A.     Federal highway statutes

[¶24.]     We begin with Sarah's reliance on state and federal statutes. Although Highway 281 is part of the National Highway System, the text of 23 U.S.C. § 116(b) provides that "[i]t shall be the duty of the State transportation department . . . to maintain . . . any project constructed under the provisions of this chapter . . . or prior acts." In SDCL 31-5-1, the Legislature further delegated this duty to the DOT, stating that "[t]he Department of Transportation shall maintain, and keep in repair, all highways or portions of highways, including the bridges and culverts, on the state trunk highway system." In addition to delegating highway maintenance and repair duties to the DOT, the Legislature vested the DOT with supervisory authority over highway construction and maintenance. SDCL 31-2-21 (providing that the DOT "shall supervise the construction and maintenance of the state trunk highway system, its bridges, and culverts").

[¶25.]     But none of these statutes impose a ministerial duty in the sovereign immunity sense. Rather, the primary purpose of these statutes is to delegate responsibility for highway construction, maintenance, and repair. While Sarah correctly notes that the use of "shall" in a statute "manifests a mandatory directive and does not confer any discretion in carrying out the action so directed," SDCL 2-14-2.1, its use in SDCL 31-2-21 and SDCL 31-5-1 simply means that the DOT is responsible for "supervis[ing] the construction and maintenance of the state trunk highway" system—not that every constituent act of construction and maintenance is ministerial. Properly read, the text of SDCL 31-2-21 and SDCL 31-5-1 does not prescribe the manner in which the DOT is to construct and maintain highways "without the exercise of judgment or discretion as to the propriety of the action." *See McGee*, 2023 S.D. 66, ¶ 30, 1 N.W.2d at 624 (quoting *Truman*, 2009 S.D. 8, ¶ 21, 762 N.W.2d at 81).[1]

---

1.     The provisions of SDCL 31-32-10 also make a handful of fleeting appearances in this case—first, in the circuit court's memorandum opinion and in Sarah's reply brief, both to support the assertion that SDCL 31-32-10 imposes a ministerial duty and, second, as part of Sarah's argument that application of the public duty doctrine would abrogate the duty imposed by SDCL 31-32-10. The statute requires a "governing body" to "erect guards" over a highway damaged by "flood, fire or other cause" within forty-eight hours after notice and to repair the damage within a reasonable time. Sarah's ministerial duty argument under this statute is foreclosed by our decision in *Hansen v. South Dakota Department of Transportation*, where we held that SDCL 31-32-10 did not create a ministerial duty because the "other cause" text was "not defined and as such fail[ed] to provide [a DOT employee] with a sufficiently specific standard of care with which to guide his decisions." 1998 S.D. 109, ¶ 28, 584 N.W.2d at 887. Further, "to the extent it endangers the safety of public travel," SDCL 31-32-10, "hardly defines a set task imposed by a law prescribing and defining the time, mode, and occasion of its performance with such certainty that nothing remains for judgment or discretion," *id.* ¶ 27 (citation modified). Under the doctrine of stare decisis, we are bound by our

(continued . . .)

[¶26.]     And none of the federal highway standards that Sarah cites transform this delegated duty into a ministerial act. Because Highway 281 is subject to a stewardship agreement between the DOT and the FHWA, the construction and maintenance of Highway 281 are governed by standards set forth in the so-called Green Book and *The Roadside Design Guide*. While these two publications certainly discuss pavement edge drop-offs and emphasize the desirability of keeping shoulders flush with the traveled roadway, neither creates a ministerial duty.

[¶27.]     For example, the Green Book provides: "All types of shoulders *should* be constructed and maintained flush with the traveled way pavement if they are to fulfill their intended function. Regular maintenance is needed to provide a flush shoulder." Am. Ass'n of State Highway & Transp. Offs., *A Pol'y on Geometric Design of Highways & Sts.*, 321 (2001) (emphasis added). And while it is questionable whether *The Roadside Design Guide* applies to routine maintenance as opposed to highway design and construction, even if it did, it provides: "Pavement edge drop-offs greater than 75 mm [3 in.] immediately adjacent to traffic *should* not be left overnight. If they are, mitigating measures *should be considered . . . .*" Am. Ass'n of State Highway & Transp. Offs., *Roadside Design Guide* § 9.5.2, 322 (4th ed. 2011) (emphasis added). It then provides a list of possible *modifiable* mitigating measures that may be taken, reinforcing its discretionary nature.

---

(. . . continued)

    holding in *Hansen*, and Sarah has not asked us to overrule it, nor has she given us sufficient justification for doing so. *See Earll v. Farmers Mutual Ins.*, 2025 S.D. 20, ¶ 32, 19 N.W.3d 536, 545 (noting how prior decisions are binding under the doctrine of stare decisis unless "departure is necessary to avoid the perpetuation of pernicious error" (quoting *In re Noem*, 2024 S.D. 11, ¶ 48, 3 N.W.3d 465, 479)).

[¶28.] The plain language of these two control documents simply provides for an optimal standard to prevent precipitous shoulder drop-offs. But neither creates a ministerial act. In other words, meeting the standard set out in these documents will not happen "in a prescribed manner without the exercise of judgment or discretion as to the propriety of the action." *McGee*, 2023 S.D. 66, ¶ 30, 1 N.W.3d at 624 (quoting *Truman*, 2009 S.D. 8, ¶ 21, 762 N.W.2d at 81).

    B. *Policy Number OM-2002-09 and Performance Standard Function 2158*

[¶29.] We reach the same conclusion for the policy and performance standards that the DOT adopted to effectuate its duty to construct, maintain, and repair highways under SDCL 31-5-1. *See* SDCL 31-2-20 ("The Department of Transportation shall advise and adopt standard plans and specifications for road, bridge, and culvert construction and maintenance suited to the needs of the different counties of the state . . . ."). As addressed above, the DOT's maintenance manual includes Policy Number OM-2002-09, which provides in pertinent part:

> Gravel shoulders shall be maintained by blading and adding material as necessary to essentially preserve the original template section. Existing gravel shoulders shall be maintained in design condition. Vegetative growth shall be controlled, as needed.

> Shoulders are to be maintained in accordance with the above guidelines using the applicable standards for the work being performed.

[¶30.] This policy, in turn, incorporates specific performance standards, which differ based on the type of "work being performed." Policy Number OM-2002-09. When it comes to gravel shoulder maintenance and repair, Performance Standard Function 2158 applies, with its stated purpose as follows:

To provide a smooth shoulder free of ruts, distortions and maintain proper crown slope. This performance standard is a *guideline to be considered* by the maintenance supervisor or their designee. *The maintenance supervisor or their designee shall retain the authority to modify or deviate from this performance standard within their discretion* based on their experience and judgment due to specific weather conditions, roadway conditions, or other events which impact upon this performance standard.

(Emphasis added.)

[¶31.] The standard goes on to outline the conditions under which "[g]ravel shoulders *should* be repaired":

1. The shoulder surface next to the pavement is more than 1-1/2" low for more than 50% of any shoulder mile.
2. The shoulder slope is less than 1/4" per foot or more than 1" per foot.
3. Heaved or high shoulders.
4. Minor edge ruts.
5. Isolated soft spots.
6. Scattered potholes.
7. Isolated area where gravel has been lost.
8. If conditions 1 through 7 above are met, and work can't be scheduled because of seasonal conditions *or other priorities*, warning signs (i.e., low shoulder, shoulder drop-off) *should* be installed until repair can be completed.

(Emphasis added.)

[¶32.] So, decisions such as *whether* or *when* a particular stretch of shoulder should be repaired necessarily involve the exercise of discretion. Though Policy Number OM-2002-09 establishes a broad requirement under which "[g]ravel shoulders shall be maintained," it is met "using the applicable standards for the work being performed"—here Performance Standard Function 2158—which, by its express terms, authorizes "[t]he maintenance supervisor or their designee . . . to

modify or deviate from this performance standard within their discretion based on their experience and judgment."

[¶33.] Standard Function 2158 also provides that "[g]ravel shoulder maintenance is not of an emergency nature and should be scheduled" around "seasonal conditions or other priorities" and "performed during moist weather conditions, if possible." Also, while the standard refers to routine inspections to identify maintenance needs, it does not specify the frequency of such inspections. Without question, neither Policy Number OM-2002-09 nor Performance Standard Function 2158 set "hard and fast rules guiding the [DOT's] actions for managing" gravel shoulders on the state's highway system. *See Adrian v. Vonk*, 2011 S.D. 84, ¶ 14, 807 N.W.2d 119, 124 (internal quotation marks omitted).

[¶34.] It is true, as Sarah observes, that our past cases have noted "that highway repair is generally considered to be ministerial in nature." *McGee*, 2023 S.D. 66, ¶ 36, 1 N.W.3d at 626 (citation modified). But in the context of our broader sovereign immunity jurisprudence, this statement does not carry the dispositive force Sarah suggests.

[¶35.] In fact, our rules clearly state that "[t]he determination as to whether an official has acted in his or her discretion or capacity, and therefore is entitled to immunity, is *not* subject to a fixed, invariable rule . . . ." *Wulf*, 2003 S.D. 105, ¶ 21, 669 N.W.2d at 143 (emphasis added) (citation omitted). And in *McGee*, itself, we repeated the settled rule that the "determination of what acts constitute discretionary or ministerial functions requires an individualized inquiry." 2023 S.D. 66, ¶ 34, 1 N.W.3d at 625. Critically, we have also noted that "highway repair

and maintenance functions will be considered discretionary, subject to sovereign immunity, when they involve actual planning and design, policy decisions, *or* actions that are not subject to an established standard." *Id.* ¶ 36, 1 N.W.3d at 626 (emphasis added).

[¶36.]        Consider this example.  Regulation A establishes a standard of maintenance for a white picket fence and further instructs that a maintenance employee "shall repaint the picket fence white after regular inspection reveals serious flaking or chipped paint."  Despite establishing a clear, identifiable standard, the regulation does not create a ministerial act because it does not "prescrib[e] and defin[e] the time, mode, and occasion of its performance with such certainty that nothing remains for judgment or discretion."  *Id.* ¶ 30, 1 N.W.3d at 624 (quoting *Truman*, 2009 S.D. 8, ¶ 21, 762 N.W.2d at 80).  Without any further guidance, the maintenance employee must, at a minimum, exercise judgment to determine the meaning of regular and whether the inevitable flaking is serious.

[¶37.]        On the other hand, Regulation B states that a maintenance employee "shall inspect the fence on the second Tuesday of every month.  If the paint on any fence board has chipped or flaked off to reveal any amount of bare wood, the maintenance employee shall immediately repaint the fence white."  Regulation B makes repainting the fence a ministerial act because the regulation defines a specific act that is "absolute, certain, and imperative."  *Truman*, 2009 S.D. 8, ¶ 21, 762 N.W.2d at 80 (quoting *Hansen*, 1998 S.D. 109, ¶ 23, 584 N.W.2d at 886).  Even though some choices are left to the discretion of the painter—like where to start and whether to use a brush or roller—the maintenance employee has no discretion as to

what to do and when. *See Wulf*, 2003 S.D. 105, ¶ 26, 669 N.W.2d at 145 (stating that "once it is determined that the act should be performed, subsequent duties may be considered ministerial" (quoting *Hansen*, 1998 S.D. 109, ¶ 23, 584 N.W.2d at 886)).

[¶38.] Policy Number OM-2002-09 and Performance Standard Function 2158 resemble the first example, Regulation A, while scenarios like those in *Wulf* and *McGee* more closely align with the second scenario, Regulation B. In *Wulf*, we held that a DOT policy that required DOT employees to spread a certain sand/salt/chemical mixture along highways from 5:00 a.m. until 7:00 p.m. during winter storms until certain highway conditions were met created a ministerial duty. *See* 2003 S.D. 105, ¶ 32, 669 N.W.2d at 146. And in *McGee*, we held that a standard specification for highway repair created a ministerial duty "that tack application ahead of the mat laydown 'shall not exceed the amount estimated for the current day's operation.'" 2023 S.D. 66, ¶ 40, 1 N.W.3d at 627. In both *Wulf* and *McGee*, "[t]here was no judgment or uncertainty" in when to carry out these obligations or how to comply with them. *Id.* ¶ 41.[2]

[¶39.] Here, however, Performance Standard Function 2158 contains much more discretion in "higher-level decisions and giving orders to effectuate those decisions." *See Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014); *see also*

---

2. This was not the case for the DOT's duty to place warning signs for exposed tack oil left on the highway, which we determined was not a ministerial duty based, in part, on the fact that the Federal Manual on Uniform Traffic Control Devices provided only a guideline for what "should" be done, rather than a mandatory directive as to what "shall" be done. *McGee*, 2023 S.D. 66, ¶ 50, 1 N.W.3d at 629.

*McGee*, 2023 S.D. 66, ¶ 41, 1 N.W.3d at 627 (citing *Marson* with approval). As such, it cannot be considered ministerial.

### C. Duty to inspect shoulder conditions

[¶40.] Sarah further contends that Michael Hieb, the highway maintenance supervisor for the area of Highway 281 where the Sanborn girls' accident occurred, had a ministerial duty to drive the roads within his area of responsibility and identify dangerous conditions. Performance Standard Function 2158 provides that "[r]outine inspections will identify needs related to gravel shoulder maintenance." In his deposition testimony, Hieb stated that in his view, based on his own experience, roadways within his territory should be inspected once a week to determine their condition. Although these weekly inspections are not within Hieb's written job description, Sarah asserts that Hieb's testimony, informed by his experience, established a "readily ascertainable standard" through which his conduct could be measured. We read the testimony differently.

[¶41.] In our view, Hieb's unilateral decision-making concerning the appropriate frequency for "routine inspections" is the quintessential discretionary act. It was an otherwise unguided act based upon his own professional experience and was the furthest thing from a ministerial act "imposed by law prescribing and defining the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion." *Truman*, 2009 S.D. 8, ¶ 21, 762 N.W.2d at 80 (quoting *Hansen*, 1998 S.D. 109, ¶ 23, 584 N.W.2d at 886). Our conclusion in this regard finds direct support in *Wulf*, where we held that a

maintenance supervisor's obligation to inspect roads within his designated territory was discretionary:

> [The defendant's] obligations as maintenance supervisor were similar[ly] [discretionary]. He was obligated to inspect the roads[,] but he was also responsible for the maintenance of over 300 miles of roads. There were no clear standards as to when or how often [the defendant] was to inspect these roads and in particular Highway 42. This was discretionary on [the defendant's] part.

*Wulf*, 2003 S.D. 105, ¶ 30, 669 N.W.2d at 146.

## Conclusion

[¶42.]	None of the highway maintenance sources that Sarah identified impose a ministerial duty upon the defendants. As such, their duties to maintain and repair the gravel shoulder along Highway 281 were discretionary and subject to sovereign immunity. Because sovereign immunity bars Sarah's individual capacity claims, we affirm the circuit court's decision to grant summary judgment, albeit on a different basis. Under the circumstances, we need not address the court's decision under the public duty doctrine.

[¶43.]	DEVANEY and MYREN, Justices, concur.

[¶44.]	JENSEN, Chief Justice, concurs specially.

[¶45.]	KERN, Retired Justice, dissents.

[¶46.]	GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.

JENSEN, Chief Justice (concurring specially).

[¶47.]	I join the majority opinion because I must conclude that the obligation to repair the damaged shoulder in this case was a discretionary function.

"[W]hether a public official's acts are discretionary or ministerial must be determined by the facts of each particular case[.]" *Hansen v. S.D. Dep't of Transp.*, 1998 S.D. 109, ¶ 23, 584 N.W.2d 881, 886 (citation omitted). Neither the statutes, nor the DOT policies relied upon by Sarah create a duty that was "absolute, certain, and imperative" as it relates to repairing the shoulder. *Id.* (citation omitted). While Policy Number OM-2002-09 (Policy) requires the DOT to maintain gravel shoulders consistent with its original design, Performance Standard Function 2158 (Standard 2158) affords DOT employees discretion as to when and how repair of a damaged shoulder is completed. In addressing repair of a damaged shoulder, the language throughout Standard 2158 uses the word "should," suggesting a recommendation rather than an obligatory duty. Unlike the ministerial duties in *McGee v. Spencer Quarries, Inc.*, 2023 S.D. 66, 1 N.W.3d 614 and *Wulf v. Senst*, 2003 S.D. 105, 669 N.W.2d 135, there is nothing in the identified statutes or DOT policies that establish a standard or timeframe requiring DOT employees to take action to repair a damaged portion of a highway shoulder.

[¶48.]   "[H]ighway repair is generally considered to be ministerial in nature[.]" *McGee*, 2023 S.D. 66, ¶ 36, 1 N.W.3d at 626 (quoting *Wulf*, 2003 S.D. 105, ¶ 23, 669 N.W.2d at 144). However, a plaintiff must still identify a standard by which an employee is required to act. This "readily ascertainable standard" may arise from a standard that is "written or the product of experience[.]" *Hansen*, 1998 S.D. 109, ¶ 23, 584 N.W.2d at 886. Sadly, in this case, the shoulder was in this condition for months, and every DOT employee recognized that the shoulder created a hazard that needed repair. This acknowledgement is mere common sense that even an

untrained eye could conclude from the photographs of this shoulder, but it is not an established standard. Similarly, the regional engineer went so far as to testify that the drop-off was a "dangerous condition" and, had he been aware of the condition, he would have requested immediate repair and that warning signs be put up pending the repair. This testimony demonstrates a prudent discretionary decision that should have been made by the regional engineer. None of this testimony, however, established a readily ascertainable governing standard that required DOT employees to act before the accident occurred.

[¶49.] The motoring public may likely be surprised, and even disappointed, to learn that there is no governing standard requiring DOT employees to repair an obviously damaged and dangerous shoulder on a roadway. In the absence of such a ministerial duty, however, expanding the State's liability for such a condition is a policy decision for the Legislature, not this Court. "Sovereign immunity is the right of public entities to be free from liability for tort claims unless waived by legislative enactment." *Truman v. Griese*, 2009 S.D. 8, ¶ 9, 762 N.W.2d 75, 78 (citations omitted).

[¶50.] Finally, I am not aligned with footnote 1 of the majority opinion reading *Hansen v. South Dakota Department of Transportation* to be dispositive on the question of whether SDCL 31-32-10 creates a ministerial duty on the State to repair damage to a highway. *Hansen* referenced that damage from an "other cause" was not specific enough to create a ministerial duty when the condition of the roadway was because of the DOT's repair work occurring on the highway, not from a damaged condition on the highway. 1998 S.D. 109, ¶ 27, 584 N.W.2d at 887.

*Hansen* rejected the application of SDCL 31-32-10 in that case because "the bridge had not been damaged by some other cause but was in the process of being repaired." *Id.* *Hansen* is distinguishable both factually and legally from an instance involving damage to a highway that "endangers the safety of public travel[.]" SDCL 31-32-10. Ultimately, the question of whether the Legislature intended to create a *ministerial duty on the State* for highway repair in such a situation was not decided in *Hansen* and remains a question for another day.

KERN, Retired Justice (dissenting).

[¶51.] I respectfully dissent. In my view, the DOT's own policies impose a ministerial duty to repair dangerously degraded gravel shoulders once objective conditions are present. Therefore, since the defendants' alleged failure is rooted in an established ministerial duty as opposed to a discretionary duty, sovereign immunity should not bar Sarah's claim.

[¶52.] The Legislature has directed that the DOT "*shall* maintain, and keep in repair, all highways or portions of highways, including the bridges and culverts, on the state trunk highway system." SDCL 31-5-1 (emphasis added). It further provided that the DOT "*shall* supervise the construction and maintenance of the state trunk highway system, its bridges, and culverts." SDCL 31-2-21 (emphasis added). In addition, because Highway 281 is subject to a DOT-FHWA stewardship agreement, its construction and maintenance are governed by the Green Book, which provides: "All types of shoulders *should* be constructed and maintained flush with the traveled way pavement if they are to fulfill their intended function.

Regular maintenance is needed to provide a flush shoulder." (Emphasis added.)

DOT's maintenance manual includes Policy Number OM-2002-09, which states:

> Gravel shoulders *shall* be maintained by blading and adding material as necessary to essentially preserve the original template section. Existing gravel shoulders *shall* be maintained in accordance with the above guidelines using the applicable standards for the work being done.

(Emphasis added.)

[¶53.]    In addition, Performance Standard Function 2158 specifies:

> To provide a smooth shoulder free of ruts, distortions and maintain proper crown slope. This performance standard is a *guideline to be considered* by the maintenance supervisor or their designee. *The maintenance supervisor or their designee shall retain the authority to modify or deviate from this performance standard within their discretion* based on their experience and judgment due to specific weather conditions, roadway conditions, or other events which impact upon this performance standard.

(Emphasis added.)

[¶54.]    Performance Standard Function 2158 also outlines conditions under

which "[g]ravel shoulders *should* be repaired":

> 1. The shoulder surface next to the pavement is more than 1-1/2" low for more than 50% of any shoulder mile.
> 2. The shoulder slope is less than 1/4" per foot or more than 1" per foot.
> 3. Heaved or high shoulders.
> 4. Minor edge ruts.
> 5. Isolated soft spots.
> 6. Scattered potholes.
> 7. Isolated area where gravel has been lost.
> 8. If conditions 1 through 7 above are met, and work can't be scheduled because of seasonal conditions or other priorities, warning signs (i.e., low shoulder, shoulder drop-off) should be installed until repair can be completed.

(Emphasis added.)

[¶55.]     The majority opinion, citing *McGee*, asserts that the use of "shall" and "should" in the relevant controlling documents provides not for an act that "envisions direct adherence to a governing rule or standard with compulsory result," but rather confers discretion in carrying out the action directed. *See McGee v. Spencer Quarries, Inc.*, 2023 S.D. 66, ¶ 30, 1 N.W.3d 614, 624. Because the DOT has discretion over whether and when a particular repair should occur, according to the majority, the act is not ministerial and sovereign immunity applies. In other words, the majority opinion seeks a standard that sets out the "prescribed manner without the exercise of judgment or discretion as to the propriety of the action." *Id.* (quoting *Truman v. Griese*, 2009 S.D. 8, ¶ 21, 762 N.W.2d 75, 81). Under the majority opinion's reasoning, the DOT may therefore be held accountable for failing to maintain a shoulder only where the Legislature has dictated the exact manner of repair without any discretion, a standard that elevates formalism over function and departs from the practical realities of highway maintenance.

[¶56.]     Sarah primarily claims that DOT employees failed to take action after the conditions in Policy Number OM-2002-09 and Performance Standard Function 2158 were satisfied, triggering a mandatory duty to repair the drop-off. Although the DOT's standards arguably allow discretion in the *manner* of repair, *Wulf* makes clear that once the DOT adopts maintenance policies and certain conditions are satisfied, the remaining duty is ministerial. *See Wulf v. Senst*, 2003 S.D. 105, ¶ 32, 669 N.W.2d 135, 146–47.[3] Notably here, Mike Hieb, the DOT Highway

---

3.     In *Wulf*, the DOT policy at issue contemplated that employees "use specified sand/salt/chemical mixtures and to continue sanding operations from 5:00

(continued . . .)

Maintenance Supervisor responsible for the applicable section of Highway 281, admitted at his deposition that it was his responsibility to drive the road and check for conditions, which he stated he did once per week before the accident. Jeff Boomsma, a local farmer who often drove the same section of Highway 281, stated at his deposition that the drop-off had been present "for approximately one year before the accident." Forrest Thompson, a witness to the accident, stated in his deposition that he traveled that section of Highway 281 often, and the drop-off "existed at least three months before the accident, if not longer." DOT engineer Mark Peterson agreed that the drop-off was a "dangerous condition" in need of immediate repair. The pictures below were taken shortly after the accident and depict the severe pavement drop-off that the Sanborns encountered, reaching seven inches at some points.

---

(. . . continued)

a.m. (in the morning) until 7:00 p.m. (in the evening) unless 1) the traffic is moving safely or 2) conditions become too hazardous for continued operations." 2003 S.D. 105, ¶ 31, 669 N.W.2d at 146. The Court held that while DOT employees may "have discretion to determine such things as how many workers to call in for a storm, how many snowplows to put on the road, and where to place them, they do not have discretion to ignore the standards or policies established by DOT." *Id.* ¶ 32, 669 N.W.2d at 147. Like in *Wulf*, although DOT employees may retain discretion over the manner of repair of the highway shoulder, they do not have discretion to disregard DOT's own maintenance standards once the triggering conditions are met for a dangerous highway shoulder as contemplated by Policy Number OM-2002-09 and Performance Standard Function 2158.

 

[¶57.]        The testimony and photos above do not suggest that the DOT chose not to make a discretionary repair they were aware of at the time.  Rather, the evidence indicates the DOT failed to follow the maintenance policies imparting a ministerial duty to repair once the repairable condition contemplated by the controlling documents was apparent.  *See id.*  The DOT's policies, through Policy Number OM-2002-09 and Performance Standard Function 2158, created an obligation to repair that is ministerial.

[¶58.]        The majority opinion uses two separate hypotheticals involving a picket fence in an attempt to provide an example for their ruling.  First, the hypothetical surrounding Regulation A is inapposite.  Regulation A analogizes Sarah's claim to chipped or flaking paint on a fence—a condition requiring pin-point judgment as to severity.  This case involves no such ambiguity.  The condition at issue was a conspicuous, dangerous shoulder drop-off on a section of highway that DOT employees testified they routinely inspected.  Peterson testified that, given such a condition, he would have expected warning signs to be placed and repairs to occur.  A more apt comparison under Regulation A would be a fence entirely stripped of paint after repeated inspections, with the maintenance employee

nevertheless failing to repaint it. By reframing the facts through this hypothetical, the majority opinion obscures the distinction between discretionary duties and the failure to act in the face of an apparent and dangerous condition requiring ministerial action.

[¶59.] The majority opinion's hypotheticals fail for a second reason: the regulations at issue here more closely resemble Regulation B than Regulation A. Under the majority opinion's own framework, Regulation B creates a ministerial duty because it prescribes a specific obligation that is "absolute, certain, and imperative." *Truman*, 2009 S.D. 8, ¶ 21, 762 N.W.2d at 80 (citation omitted). According to the majority opinion, although Regulation B permits discretion in matters of execution—such as where to begin painting or what tools to use—the maintenance employee has no discretion as to whether or when repainting must occur once the triggering condition is present. *See Wulf*, 2003 S.D. 105, ¶ 26, 669 N.W.2d at 145 ("[O]nce it is determined that the act should be performed, subsequent duties may be considered ministerial." (citation omitted)).

[¶60.] Here, Policy Number OM-2002-09 and Performance Standard Function 2158 operate in the same manner. While the standards provide DOT employees with discretion in *how* repairs are carried out, they do not permit discretion to ignore objectively dangerous shoulder conditions once identified. In other words, once Hieb discovered—or reasonably should have discovered—the degraded shoulder, the DOT had no discretion over whether or when to act, as the duty to repair was immediate and mandatory. Such interpretation is reasonable in the context of roadway maintenance, where public safety is at stake. As Peterson

confirmed, a condition of this nature would have required warning signs for passing motorists until repairs could be completed.

[¶61.]	The majority opinion also asserts that Hieb's choice to perform routine inspections is a discretionary act.  However, Hieb stated at his deposition that he drove that section of Highway 281 approximately every week.  As stated above, *Wulf* provides that once the DOT adopts maintenance guidelines and certain conditions are satisfied, the remaining obligation is ministerial.  *See id.* ¶ 32, 669 N.W.2d at 146–47.  Performance Standard Function 2158 provides that "routine inspections will identify needs related to gravel shoulder maintenance."

[¶62.]	In his deposition testimony, Hieb stated "that based on his experience, the appropriate standard [for routine inspections] was to drive the roads [within his territory] once a week to determine their condition."  When Hieb discovered—or reasonably should have discovered—the dangerous condition, per his own testimony of driving that section of Highway 281 approximately once per week, he had a ministerial duty to repair the condition.  Hieb may retain discretion regarding the manner of repair, but the controlling documents and context call for *prompt repair*, leaving no option or discretion to instead take no action at all.  Hieb is unlike the maintenance supervisor in *Wulf*, where the Court explained that his actions were discretionary, as the statute did not contemplate "when or how often [the supervisor] was to inspect . . . Highway 42." *Id.* ¶ 30, 669 N.W.2d at 146.  Hieb affirmatively adopted and carried out weekly inspections, making the dispositive issue not whether he had discretion in inspection timing, but rather whether he had

the ministerial duty to act once a dangerous condition was or should have been observed.

[¶63.]      At minimum, this case presents a question of fact inappropriate for summary judgment. A reasonable fact finder could conclude that the shoulder drop-off exceeded DOT's own repair thresholds, DOT employees knew or should have known of the condition, DOT policy required repair once those conditions existed, and the failure to act was a breach of a ministerial duty. *See Weiland v. Bumann*, 2025 S.D. 9, ¶ 36, 18 N.W.3d 148, 158; SDCL 15-6-56(c) (providing that summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law).

[¶64.]      "[H]ighway repair is generally considered to be ministerial in nature" unless such functions "involve actual planning and design, policy decisions, or actions that are not subject to an established standard." *McGee*, 2023 S.D. 66, ¶ 36, 1 N.W.3d at 626 (citations omitted). Here, Sarah is not seeking to hold the DOT accountable for highway repair and maintenance functions that involve planning, design, or policy decisions not subject to an established standard. Rather, Policy Number OM-2002-09 and Performance Standard Function 2158, along with the other controlling documents, establish a clear ministerial duty. This case simply asks whether government employees may be held accountable when they fail to execute a safety policy their own agency adopted to protect the motoring public. Because I would hold that Policy Number OM-2002-09 and Performance Standard Function 2158 create a ministerial duty once objective conditions requiring repair

exist under *Wulf*, I would affirm the circuit court's denial of summary judgment on sovereign immunity grounds.